Filed 8/22/16  American Diversified Properties v. RE/EX Valencia CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| AMERICAN DIVERSIFIED PROPERTIES, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RE/EX VALENCIA, INC., <br><br> Defendants and Respondents. | B260155 <br><br> (Los Angeles County <br> Super. Ct. No. BC360128) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge.  Affirmed.

Norminton, Wiita & Fuster, Thomas M. Norminton and Kathleen Dority Fuster for Plaintiffs and Appellants.

Gaines & Stacey, Lisa A. Weinberg and Alicia B. Bartley for Defendants and Respondents.

\* \* \* \* \* \*

**INTRODUCTION**

This is the fourth appeal in this dispute between real estate brokers over sharing a commission. Plaintiff American Diversiffed Properties, Inc. (ADP), represented the buyers of a parcel of vacant land in Santa Clarita, California. Defendants and respondents RE/EX Valencia, Inc. (Realty Executives), and Sara Fincher-Schmidt (Schmidt) represented the seller of the parcel, the Campbell Family Trust. (We will refer to the subject parcel as the "Campbell property.") ADP alleged it and Realty Executives agreed to split the commission on the sale evenly, but Realty Executives took the entire commission for itself.

When last before us, ADP appealed from the judgment for respondents and attorney fees and costs orders after a 13-day bench trial. (*American Diversified Properties, Inc. v. RE/EX Valencia, Inc.* (July 25, 2014, B246501) (2014 Appeal) [nonpub. opn.].) The trial court found ADP failed to prove the existence of a commission-sharing agreement, and moreover, ADP could not recover from respondents in quantum meruit. In a nonpublished opinion, we affirmed the judgment and orders on appeal.[1]

To recover the attorney fees and costs awarded to them, respondents moved to amend the judgment to add asserted alter egos of ADP as judgment debtors. The court granted the motion to amend in part, adding Kerry Seidenglanz and Mark Seidenglanz to the amended judgment. (We will refer to the Seidenglanz brothers and other members of their family by their first names to avoid confusion.) Respondents also moved for attorney fees and costs incurred in the 2014 Appeal, as well as attorney fees and costs for enforcing the judgment. The court granted the request for both categories of fees and costs (the additional fees order).

---

[1] The first two appeals in this matter involved a demurrer and a motion for summary judgment, respectively. (*American Diversified Properties, Inc. v. Valleywide Escrow, Inc.* (Sept. 3, 2008, B197816) [nonpub. opn.]; *American Diversified Properties, Inc. v. Realty Executives, Inc.* (June 7, 2011, B222560) [nonpub. opn.].)

ADP, Kerry, and Mark now appeal from the amended judgment and the additional fees order.[2]  Kerry and Mark argue there was insufficient evidence to deem them alter egos of ADP, and even if the evidence was sufficient, the court erred in entering the amended judgment nunc pro tunc.  All three appellants urge us to reverse the additional fees order because respondents purportedly did not provide detailed time records to substantiate their request for attorney fees.  We affirm both the amended judgment and the additional fees order.

## FACTS AND PROCEDURE

### 1.  *Respondent's Motion to Amend the Judgment*

Respondents moved to amend the judgment in January 2014 and sought to add Kerry, Mark, and 14 entities as judgment debtors on the ground of alter ego or single enterprise liability.  Because the court granted the motion only as to Kerry and Mark, we will focus primarily on the evidence relevant to them.

While ADP occasionally acts as a real estate broker, its principal business is property management, particularly of properties owned in whole or part by Seidenglanz family corporate entities.  Kerry is the president of ADP.  Kerry, Mark, and their brother Chris Seidenglanz are the sole shareholders of ADP.

Kerry and Mark were prominent witnesses at trial.  While Schmidt was the individual broker at Realty Executives who represented the seller of the Campbell property, Kerry and Mark were the individuals at ADP who acted as brokers for the buyers.  But Kerry and Mark acted as buyers as well—the purchase agreement defined the buyers as Kerry, Mark, and Bradley Business Center, a general partnership.  Kerry and Mark are general partners in Bradley Business Center along with two other individuals, and each partner owns 25 percent.  According to the evidence supporting the judgment, which we discussed at length in the 2014 Appeal, their dual role as brokers and

---

[2]  We consolidated the two appeals.  Respondents cross-appealed from the amended judgment and subsequently abandoned the cross-appeal.

3

buyers contributed to this action. Their failure to identify themselves clearly as brokers with ADP and not just buyers until well into the transaction caused confusion about any commission sharing, and respondents demonstrated there was never a meeting of the minds on a commission-sharing agreement.

According to the declaration of respondents' counsel supporting the motion to amend, counsel's investigator reported that Kerry and Mark used ADP's office for their personal business and the business of other entities in which they and their family members had ownership interests.[3] California Secretary of State records showed 13 business entities used the same address as ADP, and Kerry was the agent for service of process for 11 of those Seidenglanz family entities. Kerry confirmed these various family entities used the same address as ADP for business because ADP acted as the property manager for the entities. Based on his experience as a real estate broker and property manager, property owners commonly used the property manager's address for business purposes, i.e., for legal notices, revenue collection, and bill paying.

In connection with Kerry's judgment debtor examination, ADP produced handwritten notes of meeting minutes for various dates between 1992 and 2003, totaling approximately 57 pages. More handwritten minutes previously existed. A fire in Kerry's motor home destroyed them several weeks before the judgment debtor examination. He had taken the minutes with him on vacation to review before sending them to counsel. ADP produced photographs of the motor home fire and the investigative report compiled by the United States Department of the Interior, National Park Service, which found a faulty battery inverter caused the fire.

---

[3]     ADP objected to this portion of counsel's declaration because, among other reasons, it lacked foundation and contained "inadmissible hearsay purportedly spoken by an unidentified investigator." Respondents argued in response that the statements of the investigator were nonhearsay; they were not offered for the truth of the matter asserted, but to show the information on which they relied in attempting to enforce the judgment.

4

Kerry's mother, Gloria Seidenglanz, recorded the corporate minutes until her death in 2010. Since 2010, other employees of ADP recorded the minutes, including Kerry, Mark, and their brother Chris. Although Gloria died in 2010, ADP designated her its agent for service of process until at least October 2013. Kerry then became ADP's agent for service of process.

ADP produced other evidence of corporate formalities it followed, including its articles of incorporation, certificate of amendment of articles of incorporation, bylaws, notice of issuance of securities, statements by domestic stock corporation, issued stock certificates, and statements of information.

Respondents' motion to amend relied in large part on findings the court made in connection with an earlier motion—respondents' motion for an undertaking (bond) to stay enforcement of the judgment pending the 2014 Appeal. The court granted respondents' motion for a bond in a minute order dated March 2013 (the bond order). Respondents had argued a bond was necessary because Kerry and Mark operated ADP as their "personal piggy-bank," and there was a strong possibility ADP would become judgment proof by divesting itself of its assets by the end of the case.

The court agreed the evidence showed such a close relationship between Kerry, Mark, and ADP that respondents' concerns regarding satisfaction of the judgment were justified. Specifically, ADP contributed $137,982 toward the purchase of the Campbell property as a "loan" to Kerry and Mark in lieu of a commission they earned as brokers on a separate transaction. Kerry and Mark were then going to repay ADP with the commission they expected to received from the sale of the Campbell property. When they did not receive the commission, they repaid ADP by "let[ting] ADP keep money that they would have otherwise been due" in another transaction. In a similar vein, Kerry asked the seller of the Campbell property to reduce the purchase price by the amount of the commission ADP would earn as the buyers' broker. Kerry and Mark would then pay ADP the amount it would have received in commission. The seller refused this request, but had it not, Kerry and Mark would have realized certain tax advantages by structuring the transaction this way.

5

The court found in the bond order that this evidence created "serious concerns about the relationship between Kerry and Mark, on the one hand, and ADP on the other," without expressing any opinion about the legality of the transactions. It "wonder[ed] whether such transactions would take place were Kerry and Mark and ADP engaging in arm's length transactions," and it noted "the arms-length manner in which [Realty Executives] and [Schmidt] interacted once the fee dispute arose stands in stark contrast to the manner in which Kerry and Mark interacted with ADP."

Respondents argued these findings in the bond order demonstrated that Kerry and Mark commingled their funds with ADP, and while Kerry did not hold himself out as liable for ADP's debts, he tried to take money that was owed to ADP.

Still other evidence demonstrated the Seidenglanzes' use of ADP as a mere shell for their individual business, according to respondents. Three days after the court awarded respondents attorney fees and costs, entities owned by the Seidenglanz family started terminating their contracts with ADP for property management services. And 14 days after the attorney fees and costs award, Kerry caused the formation of a new corporation, California Commercial Realty, Inc. (California Commercial Realty), which used the same place of business as ADP. Kerry is the president and Mark is the vice president of California Commercial Realty, and they each own a third of it, along with Chris.

Most of the Seidenglanz family entities that had hired ADP for property management services engaged California Commercial Realty for the same, after terminating their contracts with ADP. ADP had eight to 10 employees. Most or perhaps all of them went to work for California Commercial Realty. ADP also sold its physical assets—office furniture, office equipment, and vehicles—to California Commercial Realty. ADP obtained two appraisals for the office furniture and equipment and sold the items to California Commercial Realty at the higher of the two appraised values ($4,270). It sold the vehicles to California Commercial Realty based on the values listed in the Kelly Blue Book and other online services.

6

Kerry testified at his judgment debtor's exam that "ADP never had the assets to ever pay the judgment, and probably never will." The court had awarded respondents $520,182.25 in attorney fees and $14,911.68 in costs against ADP. ADP always had sufficient funds to cover its expenses and debts as they came due, but it never had enough funds to cover a debt in the magnitude of $500,000. Another Seidenglanz family entity, Canyon View Limited, paid ADP's attorney fees in this litigation. Kerry, Mark, and Chris own Canyon View Limited. Canyon View Limited did not demand repayment from ADP, and ADP had not, in fact, repaid Canyon View Limited. ADP owed Canyon View Limited over $1 million in attorney fees.

Since July 2011, the highest balance ADP had in its operating account at month's end was $55,047.10. Its lowest balance in that time period was negative $2,322.16. Kerry thought ADP would never be able to pay anything other than a small portion of the judgment.

According to Kerry, "ADP had no choice but to cease operating as an ongoing business" after the court entered the fees and costs award against it. Still, ADP had not closed its operating bank account, and it was still a licensed brokerage firm in good standing with the state. The proceeds from the sale of ADP's assets to California Commercial Realty went into ADP's bank account, and ADP used the money to pay its creditors. But none of those proceeds went to respondents. They had not executed on the judgment or taken any other action to enforce it before moving to amend the judgment. ADP had approximately $11,668 in its operating account at the time it opposed the motion to amend.

2. *The Court's Statement of Decision Amending the Judgment*

The court amended the judgment under Code of Civil Procedure section 187 to add Kerry and Mark as judgment debtors.[4] It held Kerry and Mark were virtually

---

[4]     Further undesignated statutory references are to the Code of Civil Procedure.

7

represented in and controlled the litigation, a unity of interest existed between them and ADP, and treating ADP as a lone actor would lead to an inequitable result.

The evidence showing a unity of interest was as follows. ADP was a closely held family corporation in which Mark, Kerry, and their brother Chris owned all of the stock. Mark and Kerry used ADP's address for personal business and for the business of many other entities in which they own an interest. ADP did not maintain adequate corporate minutes or other corporate records and had a deceased agent for service of process for over three years.

Further, there was not an "'arm's length' distance" between Kerry and Mark on the one hand and ADP on the other. The court quoted at length from the findings in its bond order regarding the lack of arm's length dealings between the parties, and explained: "[W]hile Kerry did not hold himself out as liable for ADP's debts, he did the opposite: he tried to take money that he claimed was owed to ADP." Kerry also tried to negotiate that the commission for the sale of the Campbell property be credited to him and Mark rather than ADP.

The court additionally explained an inequitable result would follow if it adhered to the fiction of ADP's separate existence. When the court indicated its intent to award respondents attorney fees and costs, Kerry and Mark ensured that ADP would no longer have income or assets of significant value. Each of their personal and family entities that employed ADP as property manager immediately terminated ADP's services, cutting off ADP's income. They then created the new firm, California Commercial Realty, to purchase all of ADP's assets, hire all of its employees, and service all of ADP's prior customers. Thus, they had divested ADP of nearly all its assets and guaranteed ADP would never have assets to pay any portion of the judgment against it.

Although respondents prevailed as to Kerry and Mark, the court denied the motion to amend as to the slew of corporate entities on due process grounds. Respondents admitted that they did not attempt to serve any of these proposed judgment debtors with the motion to amend the judgment. None of these entities were parties to the action leading up to the judgment, they did not appear in the case, they were not "virtually

8

represented" at trial, and they did not control the litigation. Accordingly, the court added only Kerry and Mark to the amended judgment.

The court signed the amended judgment in November 2014 and entered it nunc pro tunc as of October 26, 2012. Kerry and Mark filed a timely notice of appeal from the amended judgment.

### 3. *The Additional Fees Order*

After we remanded the case in the 2014 Appeal, respondents filed a motion for additional attorney fees and costs incurred on appeal and attorney fees and costs incurred to enforce the judgment. The court granted respondents' motion, awarding them $81,020.12 for appellate fees and costs, and $129,146.50 in fees and costs for enforcing the judgment. ADP, Kerry, and Mark timely appealed from the additional fees order.

Respondents also moved for a bond pending the present appeal, and the court ordered appellants to post a bond or cash deposit in the total amount of the amended judgment plus the additional fees order—$745,260.55. Kerry and Mark posted a cash deposit for that amount.[5]

### DISCUSSION

Kerry and Mark challenge the sufficiency of the evidence underlying the court's alter ego finding, as well as the court's entering the amended judgment nunc pro tunc. All three appellants contend the court's additional fees order constituted an abuse of discretion. We reject each challenge.

### 1. *Sufficiency of the Evidence Underlying Alter Ego Liability*

"Under section 187, the trial court is authorized to amend a judgment to add additional judgment debtors. [Citations.] As a general rule, 'a court may amend its judgment at any time so that the judgment will properly designate the real defendants.' [Citations.] Judgments may be amended to add additional judgment debtors on the

---

[5]     ADP never posted a bond when the court ordered it to do so in the 2013 bond order.

9

ground that a person or entity is the alter ego of the original judgment debtor. [Citations.] 'Amendment of a judgment to add an alter ego "is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. . . . 'Such a procedure is an appropriate and complete method by which to bind new . . . defendants where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit.'"'" (*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1554-1555, fn. omitted.)

In the present case, Kerry and Mark do not challenge the court's findings that they had control of the litigation and were virtually represented in the lawsuit. The heart of this dispute is the court's alter ego finding.

Corporate entities are presumed to have existences separate from their shareholders. (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1212 (*Mid-Century*).) The alter ego doctrine arises when a party claims its adversary "is using the corporate form unjustly and in derogation of the [party's] interests." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*).) The party invoking the alter ego doctrine seeks to disregard the corporate entity, or pierce the so-called corporate veil, to hold the individual shareholders liable for the entity's actions. (*Ibid.*) This party has the burden of overcoming the presumption that the entity has a separate existence. (*Mid-Century, supra*, at p. 1212.) "Because society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation, sound public policy dictates that imposition of alter ego liability be approached with caution" (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249), and that it be used sparingly and only when the ends of justice require it (*Mesler, supra*, at p. 301).

The alter ego doctrine ""'"is not made to depend upon prior decisions involving factual situations which appear to be similar. . . . 'It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances

10

of each case.'"""" (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108 (*Toho-Towa*).)  Accordingly, "[t]here is no litmus test to determine when the corporate veil will be pierced . . . .  There are, nevertheless, two general requirements:  '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" (*Mesler, supra*, 39 Cal.3d at p. 300.)

The decision to amend the judgment to add judgment debtors "'lies in the sound discretion of the trial court.  "The greatest liberality is to be encouraged in the allowance of such amendments in order to see that justice is done."'"  (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508 (*Greenspan*).)  The underlying question of whether to pierce the corporate veil is primarily a question of fact that we review for substantial evidence.  (*Toho-Towa, supra*, 217 Cal.App.4th at p. 1108.)  Applying these standards of review, we hold substantial evidence supported the court's alter ego finding, and it therefore did not abuse its considerable discretion in adding Kerry and Mark to the amended judgment.

### a.  Unity of Interest and Ownership

Courts may consider numerous factors in determining whether a unity of interest and ownership exists between a corporate entity and its shareholders or owners.  The court in *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825 (*Associated Vendors*) catalogued many of these factors, including among others: "[c]ommingling of funds and other assets . . . [citations]; the treatment by an individual of the assets of the corporation as his own [citations]; . . . [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records . . . [citations]; . . . sole ownership of all of the stock in a corporation by one individual or the members of a family [citations]; the use of the same office or business location; . . . [citations]; . . . [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation [citations]; . . . [citations];

11

the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; . . . [citations]; [and] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations] . . . ." (*Id.* at pp. 838-840.)

The long list of factors enumerated in *Associated Vendors* is not exhaustive. (*Greenspan, supra*, 191 Cal.App.4th at p. 513.) Moreover, no single factor is determinative (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539), and "courts have cautioned against relying too heavily in isolation on . . . concentration of ownership and control" (*Mid-Century, supra*, 9 Cal.App.4th at p. 1213). While not every one of the catalogued factors need be present to pierce the corporate veil, the *Associated Vendors* court noted that, in each of the catalogued cases, at least "several" of these factors were present. (*Associated Vendors, supra*, 210 Cal.App.2d at p. 840.)

Substantial evidence supported the finding of a unity of interest and ownership in this case. Kerry and Mark focus much on which factors were *not* present, arguing, for instance, that ADP followed corporate formalities such as taking corporate meeting minutes and filing corporate documents with the Secretary of State; did not make distributions or advances to its shareholders or officers; did not commingle assets and instead maintained its own bank accounts; and always had sufficient capital to conduct its business. Moreover, they assert no evidence showed they used ADP's offices for personal business, other than the hearsay statement in opposing counsel's declaration from her investigator, and even respondents admit they did not proffer that statement for the truth of the matter. We are inclined to agree that many factors were absent in this case. But the question is not which factors were absent—it is which factors were present to establish the required unity of interest and ownership. Several factors were present here.

Certainly the ownership factor was satisfied, as Kerry, Mark, and the third Seidenglanz brother own ADP, and Kerry controlled ADP as its president. It is also clear

12

that, "to the detriment of creditors," Kerry diverted assets away from ADP to another entity owned and controlled by the Seidenglanzes. (*Associated Vendors, supra*, 210 Cal.App.2d at p. 840.) The evidence suggested that the primary business purpose of ADP was to manage properties owned by other Seidenglanz family entities. Just days after the court ordered ADP to pay respondents hundreds of thousands of dollars in attorney fees and costs, Kerry caused other entities the Seidenglanzes controlled to terminate their property management contracts with ADP, starting with Canyon View Limited. He then formed California Commercial Realty—which, like ADP, he, Mark, and their brother own—to carry on the business of ADP. California Commercial Realty acquired not only ADP's contracts, but its physical assets and its employees. In other words, Kerry and Mark manipulated "assets and liabilities between entities so as to concentrate the assets in one and the liabilities [(ADP's debt to respondents)] in another." (*Ibid.*)

Additionally, the evidence on which the court relied in the bond order tended to show that Kerry and Mark treated ADP's assets as an extension of their own and evinced a lack of arm's length dealings. When the commission dispute arose, Kerry proposed to the seller of the Campbell property that the seller reduce the purchase price by the amount of the commission ADP expected to receive. While the seller rejected that proposal, the reduction in purchase price plainly would have benefitted Kerry, Mark, and Bradley Business Center (in which Kerry and Mark were general partners) as the buyers of the property, and not ADP. Kerry wanted to structure the transaction thusly because the real estate taxes would have been lower on the property, and Kerry and Mark could have characterized their portions of the commission as "future profits," which carried income tax advantages. Kerry used ADP's purported right to a commission as a negotiating tool to benefit him, Mark, and another entity in which they held a 50 percent interest.

Evidence regarding ADP's contribution toward the purchase of the Campbell property likewise demonstrated the Seidenglanzes treated ADP's funds like their own. Bradley Business Center was selling another property at the same time it was buying the Campbell property (the concurrent sale). ADP's broker commission on the concurrent

13

sale was $137,982. Kerry caused ADP to deposit that amount with the escrow holder for the Campbell property transaction. The Seidenglanzes and Bradley Business Center then put that $137,982 toward the purchase of the Campbell property.[6]

As Kerry described it, ADP intended to lend the money to the buyers "[f]or a nanosecond," and when escrow closed and the escrow holder sent ADP its commission on the sale of the Campbell property, ADP would have kept its share of the commission for both the Campbell property *and* the concurrent sale. ADP would have then distributed the remaining share of the commission to Kerry and Mark, as the responsible brokers. But because ADP never received any commission in this case, none of that occurred. Kerry and Mark compensated ADP for its lost share of the commission from the concurrent sale through yet another transaction—that is, they "let [ADP] keep" money due to them in another transaction.

Kerry and Mark assert that this evidence—the proposal to reduce the purchase price by ADP's anticipated commission, and the use of ADP's commission from the concurrent sale in the Campbell property purchase—does not support a unity of interest and ownership because they never deprived ADP of any assets. They reimbursed ADP for the commission on the concurrent sale, and had the seller of the Campbell property accepted the purchase price reduction, they would have personally compensated ADP for its portion of that commission. But for our purposes, the question is not whether Kerry and Mark permanently deprived ADP of assets. The question is whether Kerry and Mark treated ADP's assets like their own and dealt with ADP at less than arm's length. And the evidence plainly showed that.

Kerry and Mark further protest that the court erroneously relied on opposing counsel's declaration, in which she described and characterized how they used ADP's assets. They argue the court should have sustained objections that her statements lacked

---

**6** At this point in the transaction, Kerry and Mark had substituted in another family entity called I-5/126 Limited Partnership as the buyer, along with Bradley Business Center. Kerry, Mark, and Chris are the sole owners of I-5/126 Limited Partnership.

14

foundation and relevance, were inadmissible opinion, and failed to accurately reflect Kerry's testimony. This point is not well taken. It is not at all clear the court relied solely on counsel's declaration. Our summary of this evidence relies on Kerry's testimony and exhibits in the record, not on opposing counsel's declaration. Thus, irrespective of counsel's declaration, substantial evidence existed that Kerry and Mark treated ADP's assets like their own.

Much the same may be said for the other objections to opposing counsel's declaration that Kerry and Mark renew on appeal—they are beside the point. They assert (1) the statement that the investigator reported they use ADP's office for "personal business" was vague, inadmissible hearsay, and lacked foundation and relevance; and (2) the statement that ADP produced corporate minutes only from 1978 was contrary to the evidence. Even if the court relied on these statements in counsel's declaration, plenty of other evidence in the record showed an unity of interest and ownership between Kerry and Mark on the one hand and ADP on the other.

**b. Inequitable Result**

Courts will disregard the corporate form when the entity was "used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." (*Sonora Diamond Corp. v. Superior Court, supra*, 83 Cal.App.4th at p. 538.) But "'it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an "inequitable result." In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct *amounting to bad faith* makes it inequitable . . . for the equitable owner of a corporation to hide behind its corporate veil.'" (*Mid-Century, supra*, 9 Cal.App.4th at p. 1213.)

We have no trouble finding substantial evidence of an inequitable result here. It is not simply that respondents will be unsatisfied creditors were the corporate veil to remain intact. It is that Kerry and Mark *ensured* this would be the case by immediately forming a new entity to take over ADP's business, employees, and assets when they knew

15

respondents had a substantial money judgment against ADP. Their affirmative actions set up this unhappy circumstance for respondents, and given the timing of their actions, we can certainly infer it was exactly their intent to frustrate respondents' attempts to collect any amount. Moreover, this satisfied any requirement for bad faith conduct.

Our high court provided relevant instruction in *Riddle v. Leuschner* (1959) 51 Cal.2d 574. In that declaratory relief action, the plaintiff was a creditor of the main entity defendant and sought to hold the remaining defendants liable for the debt as alter egos. (*Id*. at p. 576.) The court reasonably inferred from the evidence that the owners of the debtor entity had transferred its assets to a related entity so that the owners could remain in the same business, and "their manipulations of the affairs of the corporations were designed to foster their own purposes and operated to the disadvantage of [the debtor] and its creditors. Such conduct [was] inequitable within the rule of the cases which permit the disregard of the separate entity of a corporation." (*Id.* at pp. 581-582.) *Riddle*, in other words, demonstrates how moving assets among related entities to evade payment of obligations is itself inequitable conduct.

*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811 (*Relentless*) is also instructive. In that case, the evidence suggested that the natural persons (the Fultons) who owned the judgment debtor entity (Airborne) had gutted the entity of assets. The court had awarded the plaintiff over $175,000 in attorney fees and costs against Airborne. (*Id.* at p. 813.) The last time Airborne had any significant money was right before trial, when the Fultons withdrew $115,000 from it. (*Id.* at p. 814.) The Fultons also decided to change Airborne's general partner at the end of trial because they wanted to keep the former general partner "'completely separate [from Airborne] and the trial'" (*id.* at p. 813), giving rise to an inference that they were transferring assets from one entity to another (*id.* at p. 815). Airborne did not have any assets remaining. (*Id.* at p. 814.) The court concluded it was "highly unlikely [Airborne] will ever have assets with which to satisfy the judgment." (*Id.* at p. 816.) Given these facts, it was "inequitable as a matter of law to preclude [the plaintiff] from collecting its judgment by treating Airborne as a separate entity." (*Ibid.*) The evidence in the present

16

case that the Seidenglanzes were moving assets to avoid paying any portion of the judgment was even stronger than in *Relentless*.

Kerry and Mark suggest none of this matters because their conduct did not *cause* this unhappy result—that is, ADP never would have been able to pay the judgment in the first place, regardless of whether they gutted it of assets. They highlight their evidence of ADP's income and operating expenses, and assert ADP never had any significant net revenue after paying its operating expenses. Thus, according to them, respondents never would have been able to collect over $500,000 anyway.

This argument fails to persuade us. The evidence showed Kerry and Mark created California Commercial Realty and transferred all of ADP's contracts to it precisely to protect that future income from respondents. Even if that income did not amount, in any given month, to the over $500,000 owed to respondents, they almost certainly could have accessed at least some of that income to satisfy the judgment for attorney fees and costs. Unless the courts allow them to pierce the corporate veil, they will never be able to satisfy even part of the judgment now (except perhaps approximately $11,000, which was in ADP's account some time ago, after it sold its equipment to California Commercial Realty). If ADP had retained its ability to generate income, respondents could have collected on the judgment over time in any number of ways, such as by levying ADP's bank account after it had collected its property management fees from its clients. (E.g., § 700.140, subds. (a), (b) [permitting a judgment creditor to levy the funds in a judgment debtor's bank account].)

The Seidenglanzes would have us rule that an unsatisfied creditor must show that it could have collected its judgment in *full*, otherwise an inequitable result will not follow. We find no basis in the law for such a rule, and Kerry and Mark have not cited authority convincing us otherwise. The result is sufficiently inequitable when, on the facts of this case, their actions will prevent respondents from collecting more than they otherwise could have collected, absent application of the alter ego doctrine.

Kerry and Mark further contend the court should have sustained objections to statements in opposing counsel's declaration that "misleading[ly]" focused on evidence

17

of ADP's gross revenue, "ignoring ordinary operating costs and net revenue." They contend these statements "misstate the record evidence as a whole." But there was no reason for the court to strike this portion of counsel's declaration when counsel was simply citing to the attached financial records ADP had produced and stating the revenues reported on them. Moreover, ADP's gross revenue, not just its net revenue, was relevant. As we have discussed, respondents could have tried to collect their judgment by levying ADP's bank accounts, either before or after ADP had paid operating costs for the month. It is not as though ADP's gross revenue would never have been in play.

Kerry and Mark also make several policy arguments in an attempt to establish an "injustice" in applying the alter ego doctrine here. None of these have merit. They fault respondents for not trying to execute on the judgment before filing the motion to amend. The reason for this seems obvious. Respondents were entirely within their rights to conduct an investigation, including a judgment debtor examination and other discovery, to determine how best to collect on the judgment. (E.g., §§ 708.020, subd. (a), 708.030, subd. (a) & 708.110, subd. (a).) When they did so, they discovered the Seidenglanzes had already disposed of ADP's assets and income, rendering a levying of ADP's accounts near useless. Pursuing an amendment to the judgment based on alter ego liability represents an established form of enforcing a judgment.

Relatedly, Kerry and Mark fault respondents because they purportedly knew, or should have known, when ADP filed this action that ADP did not have the assets necessary to pay the attorney fees and costs at issue, yet respondents waited until 2014 to pursue them as alter egos. Respondents, however, had no way of knowing whether they would prevail and obtain a money judgment against ADP until it actually happened, nor did they have any way of knowing how much the court would award them. Furthermore, it is unclear why Kerry and Mark believe respondents should have known ADP could not pay the judgment before respondents conducted their judgment creditor investigation, especially when ADP managed to cover its own attorney fees with loans from Canyon View Limited, to the tune of over $1 million. We do not agree that justice would have been served by requiring respondents to pursue an alter ego theory much earlier.

18

Finally, Kerry and Mark contend respondents repeatedly commented on the Seidenglanzes' purportedly immense personal wealth, in an attempt "to unfairly influence the court against them." We see no evidence the court was unfairly influenced. The minute order granting the motion to amend and the statement of decision say nothing about Kerry's and Mark's personal wealth, and their wealth (or lack thereof) is not a factor in our decision.

"'What the [alter ego] formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.'" (*Mesler, supra*, 39 Cal.3d at p. 301.) Despite Kerry and Mark's arguments to the contrary, the trial court reached that here.

## 2. *Entering the Amended Judgment Nunc Pro Tunc*

Kerry and Mark object to the court entering the amended judgment nunc pro tunc to October 2012, the date of the original judgment. Although we agree that, procedurally, entering the amended judgment nunc pro tunc was error, Kerry and Mark have failed to demonstrate prejudice.

Respondents added the nunc pro tunc language to the proposed amended judgment because they wanted to clarify that ADP's alter egos were liable for accrued interest from the date of the original judgment, not merely for interest from the date of the amended judgment. They argued "the entry of the Amended Judgment *nunc pro tunc* will ensure that the Court's intention in this regard is clear." At a hearing on the proposed amended judgment and other issues, the court indicated it was inclined to agree with respondents. It heard argument on the matter and gave the parties a chance to file additional briefing on the issue. The court ultimately agreed with respondents and included in the amended judgment this sentence: "This Amended Judgment is entered nunc pro tunc as of October 26, 2012."

"'A nunc pro tunc order or judgment is one entered as of a time prior to the actual entry, so that it is treated as effective at the earlier date. This retroactive entry is an exercise of inherent power of the court, the object being to do justice to a litigant whose rights are threatened by a delay that is not the litigant's fault. [Citations.]' [Citation.]

19

There are limits on a court's power to enter orders nunc pro tunc." (*In re Marriage of Padgett* (2009) 172 Cal.App.4th 830, 851.) "A court can always correct a clerical, as distinguished from a judicial error which appears on the face of a decree by a *nunc pro tunc* order. [Citations.] . . . 'The function of a *nunc pro tunc* order is merely to correct the record of the judgment and not to alter the judgment actually rendered[,] not to make an order now for then, but to enter now for then an order previously made. The question presented to the court on a hearing of a motion for a *nunc pro tunc* order is: What order was in fact made at the time by the trial judge?'" (*Estate of Eckstrom* (1960) 54 Cal.2d 540, 544.) "The test for determining whether a judicial error is a clerical one . . . is whether the error is one 'which cannot reasonably be attributed to exercise of judicial consideration or discretion.'" (*Wilson v. Wilson* (1948) 88 Cal.App.2d 382, 384.)

In light of these principles, the court erred in entering the amended judgment nunc pro tunc. Adding Kerry and Mark as alter ego judgment debtors was not a simple clerical correction to reflect what the court actually pronounced in October 2012. Deciding whether to amend the judgment in this manner involved substantial judicial consideration and discretion.

Nevertheless, we may not modify a judgment unless the error was prejudicial (§ 475), and Kerry and Mark have not demonstrated prejudice. (*Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308 [appellants bear the burden of showing prejudicial error]; *Johnston, Baker & Palmer v. Record Machine & Tool Co.* (1960) 183 Cal.App.2d 200, 211 [even assuming the court erred in entering a judgment nunc pro tunc, "the appellant [was] not in a position to establish any prejudicial error because of the entry *nunc pro tunc*."]) Kerry and Mark contend prejudice exists because the nunc pro tunc language allows respondents to collect interest from them beginning in October 2012, "long before Respondents ever sought to have them deemed ADP's alter egos." This argument rests on a fallacy. The court need not have backdated the amended judgment to hold Kerry and Mark liable for interest, in addition to the principal amount of the attorney fees and costs awards. Deeming them ADP's alter egos accomplished this result.

20

As we discuss above, amending the judgment to add new judgment debtors """""bind[s] new [judgment debtors] where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit.'""" (*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd., supra*, 41 Cal.App.4th at p. 1555.) "The rationale is that the new [judgment debtor] is really one and the same as the original [judgment debtor] and, as such, was represented by the original [judgment debtor]'s participation in the trial leading to the judgment." (*Oyakawa v. Gillett* (1992) 8 Cal.App.4th 628, 631.) In theory, the court is not adding an entirely new judgment debtor, just inserting the name of the real judgment debtor. (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181, 1188.) The consequence of an alter ego finding is that the alter egos of an entity are jointly and severally liable for the entity's entire obligation or debt. (*Minnesota Mining & Manufacturing Co. v. Superior Court* (1988) 206 Cal.App.3d 1025, 1028.)

In this case, ADP's debt to respondents consists of the attorney fees and costs awards *plus* any interest provided for by law. As alter egos of ADP, Kerry and Mark are liable for this whole debt. They assert that holding them liable for interest accrued before they became judgment debtors is inequitable. There is no inequity in holding them liable for the entirety of this debt, when the requirements for alter ego liability have been satisfied, they had control of the litigation, and they were virtually represented in the lawsuit. The alter ego amendment means they were the real debtors all along. Moreover, ADP incurred the debt consisting of the principal amount of the judgment *before* the court named Kerry and Mark judgment debtors. We see no meaningful difference between holding them retroactively liable for the principal portion of the award and holding them retroactively liable for the interest portion. That is the very nature of a posttrial amendment to add alter egos.

The nunc pro tunc language was not the right procedural vehicle to clarify the issue. The amended judgment already states that Kerry and Mark are "jointly and severally" liable with ADP for respondents' costs and attorney fees. Perhaps the more

21

appropriate way to clarify the issue would have been to incorporate language that Kerry and Mark are jointly and severally liable for costs and attorney fees, *including all interest on those sums provided for by law.* In any event, the error was harmless. We will not disturb the amended judgment for this reason.

### 3. *Additional Fees Order*

ADP and the Seidenglanzes contend the court erred in basing the additional fees order on attorney-prepared summaries of billing records, rather than the billing records themselves. They point out that, in connection with prior fee motions, respondents proffered attorney-prepared summaries *and* the actual billing records summarized, suggesting that the court should have required respondents to produce the billing records again. We find no reason to disturb the court's determination here.

Respondents' counsel, Lisa Weinberg, prepared the summaries at issue after reviewing her firm's invoices from January 2013 through October 2014. She prepared two summaries: one for attorney fees incurred on appeal, and one for attorney fees incurred in enforcing the judgment. In addition, her declaration explained the necessity for the various tasks her firm billed to enforce the judgment, including: the motion for a bond to stay enforcement of the judgment; retaining an investigator to locate ADP's assets; the judgment debtor examination and document requests; the motion to amend the judgment; the motion for a bond to stay enforcement of the amended judgment; and briefing and hearings related to the various versions of the proposed amended judgment and proposed statement of decision on the motion to amend.

The summaries Weinberg prepared broke down the work by month and by attorney. Weinberg herself performed the vast majority of the work. Only one other attorney billed time during the relevant period, according to the summaries, and she did so only during two months (September and October 2013). For each month, the summaries show the name of the attorney, her billing rate, the number of hours billed, a description of the work performed, and the total fees. For example, in October 2013, the summary of appellate fees shows Weinberg spent 35.1 hours on the following work: "Prepare stipulation for extension of time to file respondents' briefs; correspond with

22

counsel; legal research; draft Respondents' brief; communicate with CAR re amicus brief." At an hourly rate of $425, this amounted to $14,917.50 in fees. In most of the months covered by the summaries, Weinberg billed far less time. For instance, the other 2013 appellate fees consisted of less than an hour in January, no time in February, less than an hour in March, less than an hour in April, 2.2 hours in May, no time in June or July, one hour in August, 10.2 hours in September, 15.9 hours in November, and 53.5 hours in December.

We review the court's award of attorney fees for abuse of discretion. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.) "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*Ibid*.)

The lodestar method of awarding attorney fees is based on "'a careful compilation of the time spent and reasonable hourly compensation.'" (*Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 447, quoting *Serrano v. Priest, supra*, 20 Cal.3d at p. 48.) "[T]he lodestar method vests the trial court with the discretion to decide which of the hours expended by the attorneys were 'reasonably spent' on the litigation. [Citation.] The lodestar amount is the product of the number of hours 'reasonably spent' and the reasonable rate." (*Meister, supra*, at p. 449.)

Our description of Weinberg's summaries above demonstrates that they constituted "'a careful compilation of the time spent.'" (*Meister v. Regents of University of California, supra*, 67 Cal.App.4th at p. 447.) They may amount to a careful compilation even if they are not the actual billing invoices sent to the client. ADP and the Seidenglanzes quote *Crespin v. Shewry* (2004) 125 Cal.App.4th 259, 271, for the proposition that "fee motions must be based on detailed time records." *Crespin*, in actuality, states that "fee motions must be based on detailed time records, *not on the memories of the attorneys involved*." (*Ibid.*, italics added.) First, Weinberg's summaries may be characterized as detailed time records. Second, respondents did not base the fee motion on the memory of the attorney. Weinberg reviewed the billing invoices to

prepare the summaries, not merely her memory of what work she performed. Thus, to the extent "detailed time records" refers only to billing invoices, the fee motion *was* based on those records.

Simply put, billing invoices need not be submitted to substantiate a fee award. Even one of the authorities on which ADP and the Seidenglanzes rely articulates this plainly: "In California, an attorney need not submit contemporaneous time records in order to recover attorney fees . . . . [Citation.] Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records." (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559 (*Martino*).) The attorney in *Martino* did not meet even this standard. He submitted a "request for a flat fee for 'services rendered,'" and "[n]o documents, such as billing or time records, were submitted to the court, nor was an attempt made to explain, in more than general terms, the extent of services rendered to the client." (*Id.* at pp. 559-560.) Additionally, "[a]t oral argument, defendant's attorney admitted he determined the fee to be paid by his clients based on a general 'feeling' about the case and the amount of work done on the client's behalf, and not by referring to detailed time or billing records." (*Id.* at p. 560.) Under these circumstances, the court held the award of $40,000 in attorney fees was an abuse of discretion. (*Ibid.*) Weinberg did far more here to substantiate and support the amount of fees requested.

ADP and the Seidenglanzes urge us to hold that, even if billing invoices are not required in every case, they should be submitted when they exist. They rely primarily on *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853 (*Ellis*), in which the appellate court affirmed the trial court's denial of fees. This case does not stand for a bright line rule that the attorney must submit billing invoices when they exist. The attorney in *Ellis* actually submitted some time records, but the court had good reasons to doubt their reliability. The court's ruling was based on the attorney's lack of credibility, failure to preserve and perhaps destroying records, and other unprofessional conduct.

24

*Ellis* was a purported class action in which class counsel (a sole practitioner) sought $24 million as a percentage of the settlement value or, alternatively, over $7 million under a lodestar approach. (*Ellis, supra*, 218 Cal.App.4th at pp. 856-857.) By contrast, her cocounsel sought only $1.1 million in fees. (*Ibid.*) The defendant opposed the sole practitioner's "'exorbitant'" fee request and conducted discovery related to it. (*Id.* at p. 856.) Many discovery disputes and years of protracted litigation followed. The sole practitioner produced hard copies of her time records and ultimately Microsoft Word files of the records, but not electronic, searchable copies with associated metadata, as the defendant had requested. (*Id.* at pp. 858-859.) She used a program called "'Wipe and Delete'" to scrub the files of metadata. (*Id.* at p. 859.) After the defendant filed a motion for sanctions, the court ordered the sole practitioner to allow a forensic inspection of her computer. (*Id.* at pp. 861-862.) Before the parties could agree on a neutral expert or establish a protocol for the inspection, the sole practitioner filed yet another fee request for over $24 million. (*Id.* at p. 863.) She eventually refused to let the inspection of her computer proceed and refused to comply with an order for her deposition. (*Id.* at pp. 864-865.)

The court ruled that because the sole practitioner had "failed to produce better evidence" of her time records and powerfully resisted efforts to discover that evidence, "the court as the finder of fact would draw a negative inference as to the reliability of the time records produced." (*Ellis, supra*, 218 Cal.App.4th at p. 866.) The court also imposed monetary sanctions of $165,000 against her for failing to comply with the court's various discovery orders regarding the forensic inspection and for failing to meet and confer in good faith about the inspection. (*Id.* at p. 868.) The court awarded fees only for her staff's work. (*Id.* at p. 874.) Against this backdrop, the trial court had not abused its discretion by drawing a negative inference as to the reliability of the time records and viewing them with distrust. (*Id.* at pp. 885-886.)

The dissimilarities between our case and *Ellis* are many. But the trial court perhaps summed it up best when it succinctly distinguished *Ellis* from our case: "Unlike the attorney's request for fees in Ellis v. Toshiba American Information Systems[, *supra*,]

25

218 Cal.App.4th 853, the Court has no reason to doubt the credibility of counsel in submitting the summaries."

In sum, we do not agree with appellant's characterization of the summaries as presenting "only the thinnest of information." They provided a sufficient basis for the court's lodestar calculation. Moreover, the trial court was the best judge of the services rendered, because it was "'aware of the nature and extent of the attorney's services from its observation of the trial proceedings . . . reflected in the file.'" (*Martino, supra*, 182 Cal.App.3d at p. 559.) The court did not abuse its discretion.

## DISPOSITION

The amended judgment and additional fees order are affirmed. Respondents shall recover their costs on appeal.


                                             FLIER, J.

WE CONCUR:



        BIGELOW, P. J.



        RUBIN, J.

26